# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>VICTOR RODRIGUEZ KESSEL, )<br>)<br>Defendant. ) | Case No. 17-cr-00246-01-SRB |

## ORDER

Before this Court is Magistrate Judge Lajuana M. Counts's Report and Recommendation (Doc. #63) to deny Defendant Victor Rodriguez Kessel's Motion to Suppress (Doc. #40). Defendant filed his Objections to Report and Recommendation on Motion to Suppress. (Doc. #76). After an independent review of the record, the applicable law, and the parties' arguments, the Court adopts the Report and Recommendation (Doc. #63). Accordingly, it is hereby

**ORDERED** that the Report and Recommendation (Doc. #63) be attached to and made a part of this Order and that Defendant's Motion to Suppress (Doc. #40) is denied.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated: May 30, 2019

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-00246-01-CR-W-SRB |
| | ) | |
| VICTOR RODRIGUEZ KESSEL, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter is currently before the Court on Defendant's Motion to Suppress (Doc. #40). For the reasons set forth below, it is recommended that this motion be denied.

### I. BACKGROUND

On July 19, 2017, a Criminal Complaint was filed against defendant Victor Rodriguez Kessel. On August 8, 2017, the Grand Jury returned a six-count Indictment against defendant Kessel. On May 2, 2018, the Grand Jury returned an eight-count Superseding Indictment against defendant Kessel. The Superseding Indictment charges defendant with conspiracy to distribute a controlled substance (Count One); attempt to manufacture 280 grams or more of cocaine base (Count Two); possession with intent to distribute 28 grams or more of cocaine base (Count Three); possession with intent to distribute cocaine (Count Four); possession with intent to distribute less than 50 kilograms of marijuana (Count Five); use of a communication facility to facilitate a drug conspiracy (Count Six); possession of a firearm in furtherance of a drug trafficking crime (Count Seven); and being a felon possession of a firearm (Count Eight).

An evidentiary hearing on the motion to suppress was held on January 3, 2019. Defendant Kessel was represented by retained counsel Sean W. Pickett. The Government was represented

by Assistant United States Attorney Bradley K. Kavanaugh. The Government called Inspector Paul Shade of the United States Postal Inspection Service and Detective Dustin Lee Atkins of the Missouri Western Interdiction of Narcotics Task Force as witnesses. No witnesses testified on behalf of the defense.

## II. FINDINGS OF FACT

On the basis of the evidence presented at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Inspector Paul Shade works in the Prohibited Mail Narcotics Division of the United States Postal Inspection Service. (Tr. at 3.) The Prohibited Mail Narcotics Division interdicts narcotics, as well as U.S. currency that is affiliated with drug trafficking, from the mail. (Tr. at 3.)

2. On the morning of July 18, 2017, Inspector Shade identified a suspicious package which was going to 6628 Oxford Avenue, Raytown, Missouri. (Tr. at 4-5; Gov. Exh. 7.) Inspector Shade listed the following factors which made the package suspicious: (1) it was an Express Mail piece, so the sender had the intent of getting the piece in and out of the mail stream very quickly; (2) it was coming from Arizona, a drug source state; (3) it had a handwritten label which is indicative of what many narcotics traffickers use; and (4) the sender waived the signature so the recipient did not have to sign for the package when delivered. (Tr. at 4.)

3. Based on these factors, Inspector Shade decided to research the package through the United States Postal Inspection Service's CLEAR database. (Tr. at 5.) The address of the sender was an apartment complex in Tucson, Arizona, but it was an improper address as it did not have an apartment number affiliated with it. (Tr. at 5.) The sender was listed as Cody Davidson. (Tr. at 5.) Inspector Shade found that there was no Cody Davidson listed for any of the apartments at that address. (Tr. at 5, 52.) The name of the recipient, Franklin Smith, was not affiliated with the address of 6628 Oxford Avenue, Raytown, Missouri. (Tr. at 5.) The CLEAR database listed Mr. Kessel and Ms. Caldwell as residing at 6628 Oxford Avenue. (Tr. at 55.) Inspector Shade testified that the fact that the two names identified on the package did not appear to be associated with the addresses on the package was very indicative of narcotics trafficking because the people dealing in these types of activities do not want to use their own names. (Tr. at 5-6.)

4. Inspector Shade contacted Detective Powell, a K-9 officer in the Interdiction Unit, and requested a K-9 sniff of the package. (Tr. at 6.) The K-9 sniff took place at approximately 8:35 a.m. (Tr. at 6.) The subject package was placed in an area

2

where there were similar type boxes. (Tr. at 6.) The K-9, Naomi, alerted to the presence of a narcotic odor coming from the subject package. (Tr. at 6.)

5. A team of four individuals (Inspector Shade and Detectives Atkins, Merrill, and Powell) was gathered to go out and do a knock and talk at the residence at 6628 Oxford Avenue. (Tr. at 7, 89.) Inspector Shade described a knock and talk as where officers go to a residence and just have a conversation with whoever is residing there to determine whether or not the package is theirs and whether or not there is anything dangerous within the package. (Tr. at 7.) Detective Atkins described a knock and talk as follows:

> When we got [sic] with a knock and talk with postal, usually Mr. Shade will knock on the door to see who answers. He'll tell them that a package was coming to the address, try to identify who they are, if they were expecting a package. Try to get their—or ask for their consent to open the package to see if there was any type of contraband or narcotics or cash inside.

(Tr. at 90.) Inspector Shade and the three other law enforcement officers arrived at the address at approximately 9:30 a.m. (Tr. at 7.) Each officer had their own car and parked down the street. (Tr. at 61.) Detective Powell had Naomi, the K-9, in his car. (Tr. at 63.) The officers were wearing bulletproof vests that were clearly identified with "Police" or "Sheriff" across the placard. (Tr. at 7, 89.) Inspector Shade testified that his vest also has "United States Postal Inspector" on it. (Tr. at 7.) The officers carried service weapons, some of which were visible, but holstered. (Tr. at 61-62, 70, 124-25.)

6. As Inspector Shade and Detective Atkins were walking up to the residence, they saw a man (later identified as Victor Kessel) standing next to a Ford F150 pickup truck which was parked in the street directly in front of the residence. (Tr. at 8, 90.) Inspector Shade testified that he identified himself as a United States Postal Inspector and asked Kessel if he was Franklin Smith. (Tr. at 8.) Kessel stated that he was not Franklin Smith. (Tr. at 9.) Inspector Shade asked Kessel if he lived at the residence of 6628 Oxford Avenue. (Tr. at 9, 91.) Kessel indicated that this was his home and that the only other resident was his girlfriend, Markita Caldwell. (Tr. at 9, 91.) Inspector Shade testified that he then told Kessel why the officers were there, that they had some concerns about what might be inside a package which was addressed to Franklin Smith at 6628 Oxford Avenue, such as that it might contain something dangerous and illegal to be mailed. (Tr. at 9.) Inspector Shade testified that Kessel said the package was not his and that Franklin Smith did not live at 6628 Oxford Avenue. (Tr. at 9.) Detective Atkins testified that Kessel said neither he nor Ms. Caldwell were expecting a package. (Tr. at 92.)

7. The conversation with Victor Kessel took place on the curb right next to the pickup

3

truck which was parked on the street in front of Kessel's residence. (Tr. at 10, 93.) The only persons present for this conversation were Inspector Shade, Detective Atkins, and Mr. Kessel. (Tr. at 10, 93.) Inspector Shade and Detective Atkins each testified that Kessel did not appear to have any difficulty understanding Shade, that Kessel responded appropriately to Shade's questions, and that Kessel had no difficulty speaking to the officers in English. (Tr. at 10, 69, 93.) Inspector Shade and Detective Atkins each testified that they did not believe that any language barrier existed between the officers and Kessel when they were talking that morning. (Tr. at 10-11, 95.) Inspector Shade and Detective Atkins each testified that at the time of this conversation, Kessel was not in custody, he had not been placed under arrest, he was not handcuffed or in any way restrained by law enforcement, and he had not been patted-down. (Tr. at 11, 93-94.) The officers had not drawn any weapons. (Tr. at 11, 94.) Inspector Shade and Detective Atkins each described the conversation as consensual. (Tr. at 11, 94-95.) Detective Atkins testified that Kessel was free to leave, although the officers did not verbally tell him that he was free to leave. (Tr. at 119-20.)

8. Inspector Shade testified that Victor Kessel gave his permission/consent to open the package. (Tr. at 9, 11-12.) Inspector Shade testified that Kessel actually said that the officers could open the package. (Tr. at 69.) Detective Atkins testified that Kessel gave verbal consent to open the package. (Tr. at 92.) Inspector Shade testified that he believed Kessel had authority to consent to the opening of the package because the package was destined for the residence that Kessel owned. (Tr. at 81.) If Inspector Shade had not interdicted the package, the Post Office would have just delivered the package to Kessel's residence. (Tr. at 82.) Inspector Shade opened the package and discovered that it contained a white powdery substance. (Tr. at 9-10, 95; Gov. Exh. 8.) The officers were concerned that the white powder might be Fentanyl because they had been dealing with that. (Tr. at 12, 95.) Inspector Shade testified that if you come into contact with Fentanyl, either through physical contact or even through inhalation, it can kill you immediately. (Tr. at 12.) The officers discussed how they were going to transport the package for their own safety. (Tr. at 12.) The officers then requested that a TruNarc be brought to the location which can safely test the product without actually having to open it. (Tr. at 12.) The conversation about the white powder which was taking place between Inspector Shade and Detective Atkins occurred in the presence of Mr. Kessel. (Tr. at 13.)

9. As Inspector Shade and Detective Atkins were speaking with each other about the white powder, Victor Kessel asked if they wanted to search his house. (Tr. at 13, 96.) Inspector Shade testified that he was shocked by Kessel's question because it was completely unsolicited. (Tr. at 13.) Detective Atkins testified that he was surprised by Kessel's offer to search his house. (Tr. at 96.) Inspector Shade and Detective Atkins testified that they were not even speaking with Kessel at the time that Kessel offered permission to search his house. (Tr. at 13, 96.) Inspector Shade asked Kessel if that would be okay with him if they searched his house, and

4

Kessel said, "Yeah, sure," and started walking toward his residence. (Tr. at 13, 96-97.) At that point, Inspector Shade, Detective Atkins, and the other two officers, Detectives Powell and Merrill, who had been hanging back by the officers' vehicles, followed Kessel up to the residence. (Tr. at 13.) Kessel took his keys out, unlocked the front door, and opened it for the officers. (Tr. at 13.)

10. When Victor Kessel opened the door, Inspector Shade and Detective Atkins stayed at the door with Kessel while Detectives Powell and Merrill did a cursory sweep of the residence to ensure that it was safe. (Tr. at 14, 97-98.) While Detectives Powell and Merrill were in the bedroom, Kessel yelled out that there was a gun in the bedroom on the chair. (Tr. at 98.) Detective Merrill located a Smith & Wesson revolver on the chair in the bedroom. (Tr. at 98.) During the protective sweep, Detectives Powell and Merrill also found narcotics and narcotic paraphernalia in plain view. (Tr. at 14, 15-16.) After the discovery of the Smith & Wesson revolver had occurred, Victor Kessel was asked if he had any weapons on his person. (Tr. at 16, 102.) Kessel indicated that he did have a weapon on his person in his front waistband. (Tr. at 16, 98.) Inspector Shade had asked Kessel earlier if he had any weapons on him and Kessel had said that he did not. (Tr. at 16, 102.) A loaded Glock Model 20, 10mm handgun was found in Kessel's front waistband. (Tr. at 16-17.) At this point, a pat-down of Kessel was performed for officer safety to ensure that there were no other weapons on Kessel's person. (Tr. at 17.)

11. Detective Atkins provided Kessel with a written consent to search form for Kessel's residence, front and back yard, trash cans, and trash bags. (Tr. at 14, 98-100; Gov. Exh. 1.) Inspector Shade testified that he was present while Detective Atkins read and explained the form to Kessel. (Tr. at 14.) Kessel was also handed the form so that he could read it himself. (Tr. at 127.) The Consent to Search form stated in part: "I understand that the Police Department has not obtained a search warrant authorizing this search and that I have a constitutional right to refuse permission to conduct the requested search." (Gov. Exh. 1.) Other than reading this form language to Kessel, Detective Atkins did not tell Kessel that he did not need to sign the consent to search form. (Tr. at 120.) Kessel signed the consent to search form at 9:45 a.m. (Tr. at 15, 99; Gov. Exh. 1.) Inspector Shade testified that Kessel was not in custody when he provided consent to search his home. (Tr. at 14.) Further, Kessel had not been placed under arrest and he was not handcuffed or in any way restrained by law enforcement prior to giving consent to search his home. (Tr. at 14-15, 101-02.) Finally, the officers had not drawn any weapons nor had they forced, threatened, coerced, or intimidated Kessel into giving consent to search his home. (Tr. at 15, 103-04.) Detective Atkins testified that Kessel freely signed his name to the consent to search form. (Tr. at 101.)

12. Detective Atkins gave Victor Kessel a *Miranda* warning at approximately 10:03 a.m. (Tr. at 17, 105.) Detective Atkins read each line of the waiver form out loud to Kessel and told Kessel that if he did not understand to let Atkins know and

5

Atkins would explain it. (Tr. at 18, 105, 108-09, 129.) Kessel stated that he understood each line of the waiver form as it was read to him. (Tr. at 18, 105-06, 108-09.) The last line of the *Miranda* warning form stated: "Having been informed of your rights, do you wish to talk to me now?" (Tr. at 107; Gov. Exh. 2.) Then there was a box for "Yes" and a box for "No." (Tr. at 107; Gov. Exh. 2.) Kessel checked "Yes." (Tr. at 107; Gov. Exh. 2.) Detective Atkins testified that he did not tell Kessel that he did not need to sign the *Miranda* warning form. (Tr. at 120.) Kessel signed the *Miranda* warning form. (Tr. at 17, 108; Gov. Exh. 2.) Detective Atkins testified that after being advised of his *Miranda* rights, Kessel chose to speak with the officers. (Tr. at 109-10.) Kessel acknowledged owning two firearms, the Glock (which was found in his waistband) and a Smith & Wesson (which was found in the master bedroom). (Tr. at 18, 20, 110.) Kessel stated, "Everything you find in the house is mine, this is my house." (Tr. at 18, 110.) Kessel also advised that a white residue found on a black plate was, in fact, crack cocaine. (Tr. at 18-19, 110.)

13. Victor Kessel gave consent, both verbally and in writing, to search his vehicles, a Jeep and a Ford F150. (Tr. at 19, 110.) Detective Atkins explained these forms to Kessel in the same manner in which he had explained the consent to search the residence earlier that morning. (Tr. at 110-11.) Detective Atkins did not tell Kessel that he did not need to sign the consent to search forms. (Tr. at 120.) These consent forms were signed by Kessel at approximately 10:30 a.m. (Tr. at 19, 111-12; Gov. Exh. 3, 4.)

14. While the officers were conducting the search of his home, Victor Kessel was seated on a loveseat just inside the front door. (Tr. at 19-20, 113.) Kessel was not handcuffed during the search. (Tr. at 20, 113.)

15. After testing with the TruNarc, the white powder substance found in the package was identified as cocaine. (Tr. at 20.) The cocaine weighed in at 274.23 grams. (Tr. at 20; Gov. Exh. 9.) An additional 156.89 grams of cocaine powder was discovered in a purse in the laundry room. (Tr. at 20.) 304.74 grams of marijuana was discovered in the master bedroom closet. (Tr. at 20-21.) Two baggies containing a total of 5.36 grams of cocaine base (crack) were also found, one in Victor Kessel's pocket and one in the cushion where Kessel had been sitting. (Tr. at 21.) A total of $1,522.25 in U.S. currency was found, $887.00 on Kessel's person and $635.25 in the master bedroom closet. (Tr. at 21.) During the search, Inspector Shade noticed some United States Postal Service paperwork. (Tr. at 21.) The paperwork was from the Asset Forfeiture Unit. (Tr. at 21-22.) Investigator Shade testified that these forms are sent to parties involved when narcotics currency has been seized through the U.S. mail. (Tr. at 22.) The paperwork showed that approximately $10,000.00 had been seized approximately two months earlier. (Tr. at 22.)

16. When the crack cocaine was recovered from Victor Kessel's pocket, he stated that

6

he owned many rental homes and that he uses crack cocaine to pay his workers at those homes. (Tr. at 22, 114-15.) This statement was made after Kessel had been advised on his *Miranda* rights. (Tr. at 22-23, 115.) Kessel also stated that he owned and was remodeling a residence at 4047 East 67th Street, Kansas City, Missouri. (Tr. at 23, 114.) Kessel gave the officers consent to search the residence at 4047 East 67th Street. (Tr. at 23, 114.)

17. As officers were searching the residence at 6628 Oxford Avenue, Raytown, Missouri, they noticed a backyard shed. (Tr. at 23.) The back yard was fenced in and there were three large dogs in the back yard. (Tr. at 23, 115.) The shed had a large hasp on it with a lock. (Tr. at 23.) The officers asked Victor Kessel for consent to search the shed. (Tr. at 23, 115.) Inspector Shade and Detective Atkins each testified that at this point, Kessel's demeanor changed. (Tr. at 24, 116.) Inspector Shade testified that Kessel became uncomfortable, shifting around in his seat. (Tr. at 24.) Detective Atkins testified that Kessel seemed more anxious. (Tr. at 116.) It was clear to Inspector Shade that Kessel did not want the officers to go look in the shed. (Tr. at 24.) Kessel refused to secure the dogs, stating that they were too dangerous. (Tr. at 24, 115-16.) Kessel revoked his consent to search the backyard shed. (Tr. at 116-17.) About the time the officers were asking Kessel about searching the shed, members of the Asset Forfeiture Unit arrived at the residence. (Tr. at 24.) Kessel asked who the folks were that arrived. (Tr. at 25.) When he was told that they were with the Asset Forfeiture Unit, Kessel revoked his consent to search the residence at 6628 Oxford Avenue and said that he was done and that he was ready to go to jail and relax. (Tr. at 25-26, 117-18.) The officers backed out of the residence and locked it down at approximately 12:30 p.m. (Tr. at 27, 71-72.) The decision was made to request a federal search warrant for the residence. (Tr. at 27.)

18. After Victor Kessel revoked his consent, Inspector Shade placed Kessel under arrest for narcotics trafficking charges and possession of cocaine and marijuana. (Tr. at 25-26, 74, 123.) Detective Atkins testified that the officers also knew that Kessel was a convicted felon who had a gun on his person and in his house. (Tr. at 123.) Inspector Shade placed Kessel under arrest at approximately 12:30 p.m., because the officers were going to transport him. (Tr. at 74, 121.) Detective Atkins testified that, in his opinion, Kessel was free to leave up to the point where he was placed under arrest. (Tr. at 130.) While Kessel had revoked his consent to search the residence at 6628 Oxford Avenue, he did not revoke his consent to search the rental property at 4047 East 67th Street. (Tr. at 26, 118.) Kessel told the officers that he would take them to that property and let them search it. (Tr. at 26.) The officers drove to the rental property with Kessel and searched the property. (Tr. at 26.) Nothing was found at that property. (Tr. at 26-27, 119.) Kessel was then transported and booked into jail. (Tr. at 27.)

19. Inspector Shade applied for and received a search warrant for the premises located at 6628 Oxford Avenue at approximately 6:31 that evening. (Tr. at 27-28, 71;

7

Gov. Exh. 5, 6.) The affidavit in support of the search warrant application stated in part:

> 15. Victor Kessel, had a loaded Glock handgun in his waistband. Kessel gave written consent to search his residence, along with the vehicles located at the residence. He stated another handgun was present in his bedroom of the residence. Officers identified the handgun and took it into custody along with the handgun on Kessel's person. Prior to searching the residence, Kansas City, Missouri Police Certified Narcotic Canine Naomi conducted an odor search in the residence. Naomi alerted to a purse located in the laundry area of the residence. Approximately 5 ounces of cocaine was located inside the purse. Victor Kessel also gave consent to search the detached shed, which was secured by a large lock and located in the backyard of his residence. However, there were three large dogs in the backyard as well and Victor refused to secure the dogs in order to allow law enforcement to access the shed. Victor Kessel then later rescinded his consent search of the residence, vehicles and shed, so the officers exited the residence and secured the location.

(Tr. at 72-73; Gov. Exh. 5.) The search warrant was executed on the residence at approximately 6:50 p.m. (Tr. at 28.)

## III. DISCUSSION

Defendant Kessel seeks to suppress all evidence and statements. Defendant first argues that he was unlawfully detained outside of his home when he was approached by a "group of armed uniformed officers and police canine" and that "any consent given during such detention is automatically invalid." (Kessel Mot. to Suppress; Doc. #40 at 2, 3.) Defendant next argues that the officers conducted a custodial interrogation in violation of defendant's Fifth Amendment rights. (*Id.* at 4.) Finally, defendant argues that the officers entered his home under false pretenses. (*Id.*) The Court will address each of defendant Kessel's arguments.

1. Defendant's Initial Contact With Officers

Defendant Kessel argues that "[a]s soon as [he] was approached by the group of armed uniformed officers and police canine, his freedom of movement was restricted constituting a

8

seizure of his person." (Kessel Mot. to Suppress; Doc. #40 at 2.) Defendant further argues that this "seizure of the Defendant was unreasonable because it was not supported by sufficient evidence that Defendant was engaged in illegal activity. The police lacked both probable cause and reasonable suspicion to detain the Defendant outside of his home." (*Id.*)

The Supreme Court has described three categories of police-citizen encounters. *See Florida v. Royer*, 460 U.S. 491 (1983). *See also United States v. Hernandez*, 854 F.2d 295, 297 (8th Cir. 1988). "The first, and least intrusive, police contact occurs when law enforcement officers merely approach an individual on the street and ask if he is willing to answer some questions. Because this encounter in a public place is consensual, it does not constitute a seizure within the meaning of the fourth amendment." *Hernandez*, 854 F.2d at 297 (citing *Royer*, 460 U.S. at 497). The second is a brief, minimally intrusive seizure or investigative stop which must be supported by a reasonable suspicion of criminal activity. *See Royer*, 460 U.S. at 498-99; *Hernandez*, 854 F.2d at 297. The third is a full-scale seizure arrest which must be supported by probable cause to arrest. *See Royer*, 460 U.S. at 499; *Hernandez*, 854 F.2d at 297.

Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual in a public place and asking him questions. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991); United *States v. Jones*, 990 F.2d 405, 408 (8th Cir.), *cert. denied*, 510 U.S. 934 (1993); *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir. 1988). No objective justification is required for such an encounter because no constitutional interest is implicated. *See United States v. Mendenhall*, 446 U.S. 544, 554-55 (1980); *United States v. Nunley*, 873 F.2d 182, 184 (8th Cir. 1989); *Campbell*, 843 F.2d at 1092. In order to determine whether a particular encounter is consensual or constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable

9

person that the person was not free to decline the officers' requests or otherwise terminate the encounter. *See Florida v. Bostick*, 501 U.S. 429, 439 (1991); *United States v. Robinson*, 984 F.2d 911, 913 (8th Cir. 1993). As long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual. Only when an officer, by means of physical force or show of authority, has in some way restrained the liberty of an individual should a court conclude that a seizure has occurred. *See Bostick*, 501 U.S. at 434; *Robinson*, 984 F.2d at 913-14.

In the present case, Inspector Shade, along with Detectives Atkins, Powell, and Merrill, intended to go out and do a knock and talk[1] at the residence at 6628 Oxford Avenue. (Fact No. 5.) However, the officers did not end up knocking on the door of the residence. As Inspector Shade and Detective Atkins were walking up to the residence, they saw a man (later identified as Victor Kessel) standing next to a pickup truck which was parked in the street directly in front of the residence. (Fact No. 6.) Inspector Shade identified himself as a United States Postal Inspector and asked Kessel if he was Franklin Smith. (*Id.*) Kessel stated that he was not Franklin Smith. (*Id.*) Inspector Shade asked Kessel if he lived at the residence of 6628 Oxford and Kessel indicated that he and his girlfriend lived there. (*Id.*) Inspector Shade testified that he then told Kessel why the officers were there, that they had some concerns about what might be inside a package which was addressed to Franklin Smith at 6628 Oxford Avenue. (*Id.*) Kessel said the package was not his and that Franklin Smith did not live at 6628 Oxford Avenue. (*Id.*) Inspector Shade and Detective Atkins each testified that at the time of this conversation, Kessel was not in

---

[1]A knock and talk is an investigatory technique in which law enforcement officers approach the door of a dwelling seeking voluntary conversation and consent to search. *See United States v. Wise*, 588 F.3d 531, 534 n.3 (8th Cir. 2009). The Eighth Circuit has acknowledged that a knock and talk is a reasonable investigative technique. *See United States v. Weston*, 443 F.3d 661, 667 (8th Cir.), *cert. denied*, 549 U.S. 956 (2006).

custody, he had not been placed under arrest, he was not handcuffed or in any way restrained by law enforcement, and he had not been patted-down. (Fact No. 7.) The officers had not drawn any weapons. (*Id.*) Inspector Shade and Detective Atkins each described the conversation as consensual. (*Id.*) The Court finds that a reasonable person would have felt free to terminate the encounter with Inspector Shade and Detective Atkins. The Court finds that the initial contact between Inspector Shade, Detective Atkins, and defendant Kessel[2] was consensual.

2.  Questions About the Package

Defendant Kessel contends that he was questioned about the package in violation of his Fifth Amendment rights:

> From the moment Defendant was detained and officers began to question him about the package, his Fifth Amendment right against self-incrimination applied. However, none of the officers advised Defendant of his Miranda Rights. The officers also failed to ensure that the Defendant had a sufficient grasp of the English language so as to understand the circumstances of his detention and questioning. No interpreter was offered or provided to Defendant.

(Kessel Mot. to Suppress; Doc. #40 at 4.)

Regarding questions about the package, the evidence before the Court is that Inspector Shade told Kessel that the officers had some concerns about what might be inside a package which was addressed to Franklin Smith at 6628 Oxford Avenue. (Fact No. 6.) Kessel said the package was not his and that Franklin Smith did not live at 6628 Oxford Avenue. (*Id.*) Inspector Shade and Detective Atkins each testified that Kessel told the officers that they could open the package. (Fact No. 8.)

As set forth above, the Court finds that the initial contact between Inspector Shade, Detective Atkins, and defendant Kessel was consensual. *Miranda* warnings are required when

---

[2]Contrary to the assertions in defendant's motion to suppress, Detectives Powell and Merrill and Naomi, the K-9, were not involved in this initial contact. (Fact Nos. 5, 9.)

there is a "custodial interrogation," which is defined by the Supreme Court as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Clearly, no *Miranda* warnings were required when Inspector Shade initially asked Kessel about the package since Kessel was not in custody. Further, the Court finds that the evidence presented at the hearing does not support defendant's assertion that the officers did not ensure that he had a sufficient grasp of the English language so as to understand the questions about the package.[3] Inspector Shade and Detective Atkins each testified that Kessel did not appear to have any difficulty understanding Shade, that Kessel responded appropriately to Shade's questions, and that Kessel had no difficulty speaking to the officers in English. (Fact No. 7.) Inspector Shade and Detective Atkins did not believe that any language barrier existed between the officers and Kessel when they were talking that morning. (*Id.*)

3. <u>Entry into Defendant's Residence</u>

Defendant Kessel claims that law enforcement personnel entered his home under false pretenses:

---

[3]The Court feels compelled to note that it was not until the very end of the suppression hearing that defense counsel stated:

> Judge, my client has asked for an interpreter at more proceedings. I had not been requested an interpreter before until just now. And so, I would just like to advise the Court that he's asked me to have an interpreter at all proceedings from here on out.

(Tr. at 143.) The Court stated at that time that based upon the Court's observations, it appeared that defendant Kessel had fully understood all the proceedings up until that point. (Tr. at 143-44.) Defendant Kessel had not previously requested an interpreter for his initial appearance (July 19, 2017), interview with a Pretrial Services officer, detention/preliminary hearing (July 21, 2017), arraignment (August 30, 2017), scheduling conference (September 13, 2017), pretrial conference (April 26, 2018), or arraignment on the superseding indictment (June 20, 2018).

> Defendant was told that the officers wanted to go inside his home "to talk." Based upon this representation, Defendant allowed them inside. However, the officers immediately spread throughout the house conducting a comprehensive search of the premises. At that point, Defendant revoked his consent when it became clear that the officers' intention was not to talk but to gain a free and warrantless search of the premises to tie the Defendant to the narcotics found in the subject package.

(Kessel Mot. to Suppress; Doc. #40 at 4.)

Once again, the evidence presented at the hearing does not support the assertions made by defendant Kessel in his motion. As Inspector Shade and Detective Atkins were speaking with each other about the white powder discovered in the package, Victor Kessel asked them if they wanted to search his house. (Fact No. 9.) Inspector Shade and Detective Atkins testified that they were shocked and surprised by Kessel's offer to search his house because it was completely unsolicited. (*Id.*) After Kessel asked them if they wanted to search his house, Inspector Shade asked Kessel if that would be okay with him, and Kessel said, "Yeah, sure," and started walking toward his residence. (*Id.*) At that point, Inspector Shade, Detective Atkins, and the other two officers, Detectives Powell and Merrill, who had been hanging back by the officers' vehicles, followed Kessel up to the residence. (*Id.*) Kessel took his keys out, unlocked the front door, and opened it for the officers. (*Id.*) When Kessel opened the door, Inspector Shade and Detective Atkins stayed at the door with Kessel while Detectives Powell and Merrill did a cursory sweep of the residence to ensure that it was safe. (Fact No. 10.) Defendant Kessel signed a written consent to search form for his residence at 9:45 a.m. (Fact No. 11.) This search took place until 12:30 p.m. when Kessel withdrew his consent. (Fact No. 17.)

With respect to defendant's assertion that the officers immediately spread throughout the house conducting a comprehensive search of the premises, the Court finds that the officers were justified in conducting a protective sweep of the residence. In *Maryland v. Buie*, 494 U.S. 325,

335 (1990), the Supreme Court held that a protective sweep in conjunction with an in-home arrest is permissible if it is a quick and limited search, conducted for the purpose of safety and narrowly confined to a cursory visual inspection of spaces where a person may be found. The Court stated:

> [T]he Fourth Amendment would permit [a] protective sweep ... if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others.

*Id.* at 327 (citations omitted). The protective sweep doctrine has been expanded beyond in-home arrests to other situations where officers are lawfully present in a home. *See United States v. Legette*, 260 Fed. Appx. 247, 249-50 (11th Cir. 2008)("Most courts reviewing this issue have expanded *Buie* beyond in-home arrests pursuant to a warrant to all situations wherein officers are lawfully present in a home."); *United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005)("Other circuits have applied *Buie* to non-arrest situations but only under the second prong of *Buie*, which requires a showing of a reasonable suspicion of dangerous individuals in the house."); *United States v. Crisolis-Gonzalez*, No. 10-00166-01-CR-W-ODS, 2012 WL 71019, *2 (W.D. Mo. Jan. 10, 2012)("[S]o long as the officers' presence is lawful, the reason for their presence is irrelevant, and in this case the officers' presence was lawful based on … consent.")

Given defendant Kessel's invitation for officers to enter the residence, the officers were lawfully present in the home. The Court further finds that the officers possessed a reasonable suspicion that their safety was at risk to justify a protective sweep. The officers were at the residence because of a suspicious package that had just been confirmed to contain a white powdery substance. (Fact No. 8.) Defendant Kessel, much to the surprise of the officers, had invited the officers into his home to search the residence. (Fact No. 9.) Given the circumstances, reasonable officers could conclude that it was necessary for their safety to secure the premises.

14

Once it was determined that no one (besides Victor Kessel) was in the house, the officers obtained Kessel's written consent to search before searching the residence further. (Fact Nos. 10, 11.) The Court finds that the officers conducted a quick and limited search for the purpose of officer safety. The protective sweep was valid.

4.   Consent to Search

Throughout his motion, defendant argues that his consent to search was neither knowing, intelligent, nor voluntary. (Kessel Mot. to Suppress; Doc. #40.)

"Under the Fourth Amendment, 'searches and seizures inside a home without a warrant are presumptively unreasonable.'" *United States v. Comstock*, 531 F.3d 667, 675 (8th Cir. 2008) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). "Equally fundamental, however, is the principle that a warrantless search of a residence does not violate the Fourth Amendment where police obtain a resident's consent." *Comstock*, 531 F.3d at 675 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

The government bears the burden of proving that consent was voluntarily given. *See United States v. Willie*, 462 F.3d 892, 896 (8th Cir. 2006), *cert. denied*, 549 U.S. 1292 (2007). The test in reviewing a consent search is whether, in the totality of the circumstances, the consent was given voluntarily and without coercion. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014). In *United States v. Willie*, the court set forth the following guidance in judging the voluntariness of a consent to search:

> Our case law offers a catalogue of factors to consider in judging the voluntariness of a defendant's consent to search. Some relate to the characteristics and behavior of the defendant, such as the defendant's age, intelligence and education, knowledge of his constitutional rights (whether from *Miranda* warnings in the encounter at issue or from previous interactions with police), whether he was

15

> under the influence of drugs or alcohol, and whether he objected to the search or stood by silently as it was occurring. ... Others relate to the environment surrounding the defendant at the time he gave his consent, such as whether he was in custody or under arrest and whether he was in a public or secluded place. ... Still others relate to the interaction between police and the defendant in the encounter, such as whether police officers detained and questioned the defendant for a long time before obtaining his consent, whether they threatened, physically intimidated, or punished him, and whether they made promises or misrepresentations upon which the defendant relied in giving his consent. ... No one factor is dispositive; they are merely tools for analyzing the "totality of all the circumstances." ...

462 F.3d at 896 (citations omitted).

With respect to defendant Kessel's consent to search, the evidence before the Court is that Kessel asked the officers if they wanted to search his house. (Fact No. 9.) Kessel then signed written consent to search forms after Detective Atkins read and explained the forms to Kessel. (Fact Nos. 11, 13.) Kessel was also handed the forms so that he could read them himself. (*Id.*) The Consent to Search form stated in part: "I understand that the Police Department has not obtained a search warrant authorizing this search and that I have a constitutional right to refuse permission to conduct the requested search." (Fact No. 11.) Kessel was not in custody when he provided consent to search. (*Id.*) Further, Kessel had not been placed under arrest and he was not handcuffed or in any way restrained by law enforcement prior to giving consent to search. (*Id.*) Finally, the officers had not drawn any weapons nor had they forced, threatened, coerced, or intimidated Kessel into giving consent to search. (*Id.*) Defendant Kessel was born on March 10, 1956. (Superseding Indictment; Doc. #34 at 1.) Thus, Kessel was 61 years old at the time in question. Kessel, although born and raised in Cuba, has resided in the United States since 1980. (Pretrial Services Report; Doc. #5.) This was not Kessel's first interaction with law enforcement. (*Id.*) No evidence was presented to indicate that Kessel was under the influence of alcohol or drugs. As set forth above, Inspector Shade and Detective Atkins each testified that Kessel did not

appear to have any difficulty understanding Shade, that Kessel responded appropriately to Shade's questions, and that Kessel had no difficulty speaking to the officers in English. (Fact No. 7.) Inspector Shade and Detective Atkins did not believe that any language barrier existed between the officers and Kessel when they were talking that morning. (*Id.*) While the officers were conducting the search of his home, Kessel was seated on a loveseat just inside the front door. (Fact No. 14.) Kessel allowed the search to continue until 12:30 p.m., at which time he revoked his consent, stating that he was ready to go to jail. (Fact No. 17.)

The Court finds that the government met its burden in establishing that defendant Kessel's consent to search his residence and vehicles was freely and voluntarily given and not the result of duress or coercion.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's Motion to Suppress (Doc. #40).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

*/s/ Lajuana M. Counts*
Lajuana M. Counts
United States Magistrate Judge